# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLORADO
## Judge Daniel D. Domenico

Case No. 1:17-cv-01158-DDD-SKC

GUNNAR NITZKORSKI,
STEPHEN PERNICE, and
JOSEPH GROS,

  Plaintiffs,

v.

COLUMBINE EMERGENCY MEDICAL SERVICES INC., and VINCENT CISSELL,

  Defendants.

## ORDER OF PARTIAL SUMMARY JUDGMENT

  The stereotypical nine-to-five schedule, which results in a forty-hour work week, is the foundation on which important labor laws, including the federal Fair Labor Standards Act ("FLSA") and the Colorado Wage Claims Act ("CWCA"), are established. Though they clearly permit employers to pay overtime on a daily basis, these statutes don't always comfortably govern businesses that employ professionals that work atypical hours. This case involves whether and how the square peg of ambulance drivers working 24-hour shifts fits within the round hole of the overtime requirements founded upon a traditional 40-hour workweek. While it can be more complicated to pay employees by the shift and still comply with overtime laws, it is permissible to do so, and in this case, the evidence shows that Defendants have abided by the FLSA. They are therefore entitled to partial summary judgment.

**BACKGROUND**

The basic facts are not in dispute. Defendant Vincent Cissell is an officer of Defendant Columbine Emergency Medical Services Inc.[1] Plaintiffs Gunnar Nitzkorski, Stephen Pernice, and Joseph Gros are former employees of Columbine who worked 24-hour shifts for the company as paramedics and emergency medical technicians.[2] Plaintiffs' work hours were based on the so-called "Kelly" shift schedule—an assignment system frequently used in the emergency services field in which three teams of employees are assigned to rotating 24-hour shifts.[3] Pursuant to this schedule, in a given week, Plaintiffs generally worked either two or three regularly scheduled 24-hour shifts (so either forty-eight or seventy-two hours total per week) and were paid by the shift. For example, in 2015, Mr. Nitzkorski was paid $319.00 per 24-hour shift. For the time period March 1–13, 2015, he worked three regularly scheduled shifts (on

---

[1] Though immaterial to this order, it remains disputed whether Plaintiffs were employees of both Columbine and Mr. Cissell or just Columbine.

[2] Mr. Nitzkorski worked for Defendants from April 4, 2007 to February 28, 2017; Mr. Pernice worked for Defendants from February 1 to July 1, 2017; and Mr. Gros worked for Defendants from June 1, 2003 to December 31, 2014. (Doc. 38-2, at 16.)

[3] Under this system, there were three "teams" (A, B, and C), which were scheduled for 7:00 a.m. to 7:00 a.m. shifts in consecutive alternation (i.e., Team A would work Day 1; Team B would work Day 2, Team C would work Day 3, Team A would work Day 4, and so on). This was long the most common shift system for emergency services providers, but recently a "48/96" model has become increasingly popular. That model is similar, essentially doubling the relevant time periods so employees work 48-hour shifts, then have ninety-six hours off. While it may have other benefits, it would seem to present the same sort of legal issues. *See, e.g.*, Caputo, et al., "The impact of changing work schedules on American firefighters' sleep patterns and well-being," *Signa Vitae* 10(1):25-37 (2015).

the 5th, 7th, and 9th), for which he was paid $957.00 total.[4] Plaintiffs did not respond to 911 emergency calls and had substantial downtime, during which they had access to a bedroom, shower, kitchen, and recreation room.[5] Plaintiffs were not generally required to remain at the Columbine station for the entirety of their shifts, but were permitted to (and did) sleep, run personal errands, go out to eat, and shop.

Plaintiffs understood that they were being paid by the shift. But according to Defendants, these 24-hour shift rates were computed by further breaking them down into three categories of time: eight hours at a regular pay rate; thirteen hours of overtime pay at a rate of one-and-one-half times regular pay; and three hours of lunch and break time for which Plaintiffs received no pay. So, to use Mr. Nitzkorski's 2015 pay as an example, Defendants' internal spreadsheets show he had an hourly "Reg. Hr. Pay" of $11.60 and an hourly "OT – Pay Rate" of $17.40. So, during a normal shift during this time period, Defendants say he was paid for eight hours at $11.60, for thirteen hours at $17.40, and for three hours at $0.00—which together equals $319.00 for the shift.

On those instances where Plaintiffs worked less than their full 24-hour shift, they were paid for their first eight hours at the regular

---

[4] In addition to their regularly scheduled shifts, Plaintiffs sometimes worked additional shifts. For these, Columbine paid Plaintiffs their shift rate plus an extra 20% (designated as "OTR"). For the March 1–13, 2015 period, Mr. Nitzkorski also worked three additional shifts (on the 4th, 11th, and 13th) for which he was paid another $1,148.40, representing his normal shift pay times 120%. This 20% premium Defendants paid to employees who worked irregular shifts is sometimes called "overtime." This "overtime" is not the overtime at issue in this case.

[5] The nature of their work made the amount of down time unpredictable: "Q. And over the course of a week, you may get a few calls and you may get practically no calls; correct? A. Yes. That could happen." (Doc. 38-5, at 42:5–7.)

3

rate, and at the overtime rate for the remaining hours. For example, on one of his shifts during the March 13–29, 2015 time period, Mr. Nitzkorski only worked eleven hours. For this shift, he was paid $11.60 per hour for the first eight hours and $17.40 for the next three hours.

Although these calculations and payments are reflected in Columbine's internal documents and in the pay Plaintiffs received, this system of calculating Plaintiffs' various hourly rates was never expressly communicated to Plaintiffs.

## LEGAL ANALYSIS

The FLSA issues remaining in the case are (A) whether Defendants' asserted practice of paying time-and-one-half for thirteen hours per shift complies with their overtime obligations; (B) whether Defendants not paying Plaintiffs for three hours of work per shift is permissibly excludable as downtime; and (C) whether Defendants' violations, if any, were willful. The various briefing provided by the parties reveals that the material facts about what happened are generally uncontested; the disagreement is essentially over the legal implications of the facts. The Court therefore concludes that these issues are legal, rather than factual, disputes, and are appropriate for resolution under Rule 56.[6]

---

[6] A court may grant summary judgment if "the losing party was on notice that [it] had to come forward with all of [its] evidence." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 892 (10th Cir. 1997). Both parties here have filed, and responded to, motions for summary judgment. As Plaintiffs have consistently maintained, most if not all the issues in this case are legal rather than factual disputes.

### A. Overtime

The FLSA generally requires covered employers to pay their employees overtime pay for work in excess of forty hours a week. Overtime hours must be compensated "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1). The regular rate "shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee," with eight exceptions. 29 U.S.C. § 207(e). So, the first step in many FLSA disputes is to determine an employee's regular rate. *See Walling v. Youngerman–Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945) ("The keystone of Section 7(a) is the regular rate of compensation. On that depends the amount of overtime payments which are necessary to effectuate the statutory purposes. The proper determination of that rate is therefore of prime importance.").

Relevant here, the "regular rate" does not include "extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of eight in a day." 29 U.S.C. § 207(e)(5). This "extra compensation" is "creditable toward overtime compensation" otherwise required to be paid. *Id.* § 207(h)(2). But employers may not abuse these statutory provisions by arbitrarily splitting a workday into two artificial rates of pay to avoid paying overtime. *Walling*, 323 U.S. 37.

Under the Kelly system, it can be complicated, inconsistent, and unpredictable to calculate wages on the 40-hour model upon which the FLSA is premised because, in any given week, an employee is likely to work two or three 24-hour shifts. Depending on the week, an employee might log either forty-eight or seventy-two hours, which would be either

5

eight or thirty-two hours of overtime under the 40-hour model.[7] Employers often address these complications by counting all time after the first eight hours of any shift at an overtime rate rather than attempting to change the pay calculations each week. So, in a two-shift week, assuming an employee is paid for every hour in his shift, that employee is paid for sixteen hours at the regular rate, and for thirty-two hours at an overtime rate. In a three-shift week, that employee is paid for twenty-four hours at the regular rate, and forty-eight hours at an overtime rate. Defendants point out that, under either scenario, the employee would get more than the required amount of overtime pay.

It's clear that this system is legal if done correctly. Employers are statutorily permitted to meet their overtime obligations by paying employees time-and-one-half premium rates for hours worked in excess of eight in one day. Defendants believe their pay scheme met this requirement (at least with respect to the first twenty-one hours per shift) based on the division of their daily shift rate as described above. *See* 29 C.F.R. § 778.202(a) ("A written or unwritten employment contract, agreement, understanding, handbook, policy, or practice may provide for the payment of overtime compensation for hours worked in excess of 8 per day or 40 per week . . . . [and] is excludable from the regular rate under section 7(e)(5) of the Act and may be credited toward statutory overtime payments pursuant to section 7(h) of the Act."); *see also, e.g.*, *Ramirez v. Home Nurse Corp.*, No. 17-21802-CIV, 2018 WL 318472, at *4 (S.D. Fla. Jan. 4, 2018), *appeal dismissed sub nom.*, No. 18-10292-AA, 2018 WL 2022628 (11th Cir. Feb. 21, 2018) ("The Fair Labor Standards Act offers no support for [the] suggestion that because [the employer] compensated

---

[7]  Assuming all on-call hours are counted. This is addressed below.

him using a daily shift rate, [it] did not pay him the proper overtime premium for work performed in excess of 40 hours per week.").

Plaintiffs disagree, condemning what they see as the practice of arbitrarily dividing the working day into chunks of time at separately compensable rates to avoid paying overtime altogether. And they are correct that, in certain circumstances, daily line-drawing is not permissible. *See* 29 C.F.R. § 778.500(a) (The "overtime provisions of the [FLSA] cannot be avoided by setting an artificially low hourly rate upon which overtime pay is to be based and making up the additional compensation due to employees by other means."); 29 C.F.R. § 778.501(a) (decrying the "split-day" plan, in which "the normal or regular workday is artificially divided into two portions one of which is arbitrarily labeled the 'straight time' portion of the day and the other the 'overtime' portion").[8] Plaintiffs argue that for Defendants to take advantage of the statutorily permitted premium pay allowance there must be a contract memorializing that arrangement. And as Plaintiffs point out, although they knew they were being paid by the day, there is no evidence of an express agreement between the parties further breaking down their pay according to Defendants' daily scheme.

---

[8] As explained above, Defendants' payment calculation is not a traditionally offensive "split-day" plan. Using daily, rather than weekly, divisions for overtime is undeniably legal. *See, e.g., Goulas v. LaGreca*, 557 F. App'x 337, 338 (5th Cir. 2014) (per curiam) (ruling a split of the workday into eight hours of straight time and an additional overtime period "did not show such an impermissible split day plan"); *Parth v. Ponoma Valley Hops. Med. Ctr.*, 630 F.3d 794 (9th Cir. 2010) (ruling that paying eight hours of regular rate and four hours of overtime rate is not a split day).

7

Such agreement is not the only way of establishing that a Kelly system pay rate is legal. It is legal so long as the parties had an agreement, understanding, or practice demonstrating that certain hours were actually paid at an overtime premium. 29 C.F.R. § 778.202(a); *see also Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 464 (1948) ("As the regular rate of pay cannot be left to a declaration by the parties as to what is to be treated as the regular rate for an employee, it must be drawn from what happens under the employment contract."); *Adams v. Dep't of Juvenile Justice of City of New York*, 143 F.3d 61, 67 (2d Cir. 1998) (If the pay rate "was properly intended by the parties to account for both a regular rate and an overtime rate, the contemplated arrangement is in compliance with the FLSA.").

Many district courts have addressed this issue, but the Court finds two cases especially instructive. In *Seraphin v. TomKats, Inc.*, the plaintiffs were paid a $200 daily rate for work lasting twelve to fourteen hours, and the parties disputed whether that daily rate was inclusive of an overtime premium for hours worked after eight hours. No. 11-CV-4382-FB-LB, 2013 WL 940914, at *1 (E.D.N.Y. Mar. 11, 2013). The court granted summary judgment for the defendants—over the plaintiffs' objection that the defendants' explanation was vague and shifting—and accepted defendants' argument that hours after the eighth were paid at a premium rate:

> Although neither party has presented the Court with a signed employment agreement, defendants offer a one-page memorandum, titled "Movie Employee Pay Calculation," that describes the pay breakdown for day rate employees. ("For Payroll Calculations Hourly Rate is Determined based upon a 14-hour day assuming 8 hours is straight time and 6 hours is overtime."). Defendants claim that they sent this notice to all employees around January 2009. Plaintiff insists that he never received it and suggests that it is a fabrication. . . .

8

> The factual disputes surrounding this memorandum, however, are insufficient to create a triable issue of fact. Plaintiff has not offered sufficient evidence to establish that notice was required or that the purported breakdown is a sham. In cases where courts have questioned the employers' assertions that a fixed rate included an overtime premium, there was evidence of suspicious bookkeeping errors, evidence of backward-adjusting, a lack of evidence that the hourly rate was ever used, or some other evidence to suggest that the practice was a sham. In the present case, there is nothing of the sort. Plaintiff's alleged lack of understanding, without any evidence to suggest an FLSA violation, is simply not enough to withstand summary judgment.

*Id.* at *4 (internal citations omitted).

In *Adams v. Nature's Expressions Landscaping Inc.*, No. 5:16-CV-00098-JMH, 2017 WL 4844560, at *1 (E.D. Ky. Oct. 25, 2017), the facts were at least superficially similar, but the court reached opposite result. A landscaping business paid its employee $160 per ten-hour day, prorated to the nearest quarter-day. So, if an employee worked only seven-and-one-half hours, his $160 per day would be prorated to three-fourths of the total daily rate. *Id.* Citing express language in its contracts dividing the ten-hour daily rate into regular and "overtime" pay,[9] the landscaping company argued it had complied with the FLSA as a matter of law. The court disagreed:

---

[9] For example, as the court recounted, one of the contracts at issue stated that the employee will "receive a weekly paycheck based on $130/day. This breaks down as follows: for the first eight hours, [employee] receives $10.40 per hour, for a total of $83.20. The next three hours—hours worked in excess of eight per day and thus 'overtime'—[employer] pays [employee] $15.60 per hour, for a total of $46.80." *Adams*, 2017 WL 4844560, at *7. "Added together, the regular pay ($83.20) and overtime pay ($46.80) come to a total of $130—the same amount [the employer] lists as [the employee's] expected daily earnings." *Id.*

> Although similar to *Seraphin*, this case is distinguishable in at least one crucial respect. The defendant employer in *Seraphin* produced pay records to corroborate its argument that regular and overtime rates were built in to the employee's daily pay. . . .
>
> First, unlike in *Seraphin*, [the employer] has presented no corroborating evidence that it ever actually paid employees based on regular and overtime rates. Second, [the employee's] work during the October 2016 week suggests [the employer] paid him at a rate not contained in the contract. Indeed, the records support the claim that [the employer] paid [the employee] *at the same* hourly rate for all hours worked [whether or not Plaintiff was above or below the eight-hour threshold]. . . . This payment amount defies [the employer]'s explanation of its compensation scheme. . . .
>
> [I]f [the employer] simply prorated daily sums and paid the same rate even for hours worked in excess of eight per day, then the total sum of the employees' weekly paychecks is included in the regular rate determination, the employees are entitled to a higher overtime rate, and [the employer] has not complied with the overtime requirements.

*Id.* at *10–*12 (emphasis in original). Based on the court's factual uncertainty, it denied the defendant's motion for summary judgment. *Id.* at *12.

This case more closely matches *Seraphin* than *Adams*, but the analysis in both supports the conclusion reached here. As in *Seraphin*, neither party has presented a written employment agreement. But, as *Adams* reveals, even the existence of such an agreement is not dispositive, or even material, if that agreement is not adhered to by the employer. It is the actual conduct that matters. Like the plaintiffs in *Seraphin*, Plaintiffs here argue that they not only did not agree to, but were not even aware of, their overtime pay being broken down as Defendants say. They support this unawareness with pay stubs, which Defendants admit do not expressly divide the days into regular and overtime pay. (*See, e.g.*, Doc. 38-2.) But unlike in *Adams*, the records filed on

10

summary judgment here demonstrate that Defendants' alleged daily breakdown was not arbitrarily reverse-engineered; it was put in place to best account for the likelihood that Plaintiffs would be working more than forty hours every week. The material fact is not whether employees had actual knowledge of the employer's method of paying overtime, but whether there was a "contract, agreement, understanding, handbook, policy, or practice," 29 C.F.R. § 778.202(a), that provided for payment of the same.

There was at the least a practice of doing so here. Columbine's internal payroll forms, consistent with its unwavering position at deposition and throughout this case, separate an employee's hourly "regular rate" from his hourly "OT – Pay Rate." (*See* Doc. 39-10.) And as in *Seraphin*, Plaintiffs do "not question the authenticity of the pay records [or] . . . that defendants' breakdown of the daily rate results in the exact regular hourly rate that is listed on [their] pay records." *Seraphin*, 2013 WL 940914, at *3.

And perhaps most significantly, unlike in *Adams*, Plaintiffs cannot dispute that when they worked less than the full twenty-four hours of their shift, they were paid at the regular rate for the first eight hours and at the overtime rate for all hours worked thereafter. (Doc. 39-4, at 65; *see also*, *e.g.*, Doc. 39-9, at 5.) Defendants did not, as the defendant in *Adams* did, simply pay Plaintiffs a pro-rata portion of their usual shift pay when they worked fewer hours. Defendants' legitimate pay practice is reflected in paychecks, which Plaintiffs received. This effectively undermines any argument that the Plaintiffs' regular pay was something other than what they were paid those first eight hours. This reflects a consistent practice, accepted by Plaintiffs during their employment, of actually paying at the divided rates consistent with Defendants' claim.

11

Other than Plaintiffs' suppositions of arbitrary line-drawing, they have not provided evidence to create a legitimate factual dispute to question that Defendants' had an actual practice of providing overtime compensation for hours worked in excess of eight per day. As the court reflected in *Seraphin*, there is here no evidence of suspicious bookkeeping errors, evidence of backward-adjusting, a lack of evidence that the hourly rate was ever used, or some other evidence to suggest that the practice was a sham. Plaintiff's alleged lack of understanding, without any evidence to suggest an FLSA violation, is simply not enough to withstand summary judgment.

Plaintiffs would have the Court hold that an employer's method, like the one at issue here, of paying overtime daily violates the FLSA unless some contract establishes that arrangement.[10] It's true that the statutes, regulations, and cases create a regime in which a plaintiff can prevail by showing that his purported hourly rate was a sham not actually followed by the employer or by showing that the pay he received was contrary to the employer's contracts or other agreements with its employees. But it's equally true that where a legitimate practice was consistently adhered to by the employer, and where an employee has no evidence that he or she was promised something else, a daily overtime pay scheme like the one Defendants used is permissible under the FLSA.

---

[10] They say that the "interpretive regulation on point refers to this kind of pay as 'contract overtime compensation.' 29 C.F.R. §778.202(a)." (Doc. 93, at 3.) That is a misquote. That regulation does not refer to this kind of pay as "contract overtime compensation." Instead, as quoted above, it says that a "written or unwritten employment contract, agreement, understanding, handbook, policy, or practice may provide for the payment of overtime compensation for hours worked in excess of 8 per day or 40 per week." 29 C.F.R. § 778.202(a).

The Court therefore holds—upon its review of the entire summary judgment record, the undisputed facts, and the parties' supplemental briefing—that there is no genuine issue of material fact that Defendants paid Plaintiffs in accordance with the overtime requirements of the FLSA for up to and including the first twenty-one hours of every shift.

**B. Downtime**

The parties also dispute whether Defendants' admitted practice of not paying Plaintiffs at all for three hours of each 24-hour shift was permissible. Defendants remain adamant that it was, calling this time "break and/or lunch periods." Plaintiffs' respond that it is Defendants' burden to prove that the hours in question are non-compensable, and Defendants can't meet their burden because they never clearly communicated their practice of excluding this time.

The parties agree on the governing legal standard. "An employer seeking to avoid application of the FLSA's general rule that work is compensable bears the burden of proving an exception." *Fowler v. Incor*, 279 F. App'x 590, 598 (10th Cir. 2008). There also does not appear to be any suggestion that there were any days in which Plaintiffs actually responded to calls for more than twenty-one hours. That is, each 24-hour shift involved at least three hours of on-call downtime. The question is whether that time is nonetheless compensable.

"Whether periods of waiting for work should be compensable under the FLSA is to be determined by the facts and circumstances of each case." *Norton v. Worthen Van Serv., Inc.*, 839 F.2d 653, 654 (10th Cir. 1988). Courts sometimes frame the ultimate question as "whether the employee is 'engaged to wait' or 'waiting to be engaged.'" *See Pabst v.*

*Oklahoma Gas & Elec. Co.*, 228 F.3d 1128, 1132 (10th Cir. 2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S.134, 137 (1944)) (internal alterations omitted). Alternatively, courts ask whether the on-call time is spent "primarily for the benefit of the employer and his business." *Armour & Co. v. Wantock*, 323 U.S. 126, 132 (1944). The regulations at 29 C.F.R. §§ 785.14–22 provide some further clarity.

Courts have considered many factors in determining whether an employee plaintiff had use of on-call time for personal purposes: (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time. *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350–51 (9th Cir. 1992), *as amended* (Aug. 18, 1992) (citing *Armour*, 323 U.S. at 134; *Norton*, 839 F.2d at 655–56; *Renfro v. City of Emporia*, 948 F.2d 1529, 1538 (10th Cir. 1991); *Brock v. El Paso Nat. Gas Co.*, 826 F.2d 369, 373 (5th Cir. 1987); *Cross v. Arkansas Forestry Comm'n,* 938 F.2d 912, 916–17 (8th Cir. 1991)). This list is illustrative, not exhaustive. No one factor is dispositive. *Id.*

Here, when Plaintiffs were at the station, they had access to living and sleeping quarters, including full kitchen facilities, couches, cable TV, bathrooms, showers, and separate sleeping areas. They had time to watch TV, make personal calls, and cook. But crucially, Plaintiffs were not required to stay at the station. Although they always had to be prepared to respond to calls, they could go shopping, go out to eat, and run errands—sometimes, as they admit, for "a couple hours" at a time. If

they lived close enough to the station, Plaintiffs could even "run home to get some food or to get a phone charger or something." When asked whether there was any requirement that he stay at the station during his 24-hour shift, Mr. Nitzkorski testified that he was only required to be there after midnight. (Doc. 52-2, at 28.) And Mr. Gros testified that, on average, he had more downtime than actual work time and, over the course of some weeks, he might not have to respond to any calls at all. (Doc. 38-5, at 7.) In short, as Plaintiffs themselves argue, there "is no dispute of material fact as to the fact that [they] did have some 'down time' during their shifts." (Doc. 39, at 10.)

Again, in Plaintiffs own words, the "dispute is a legal one, i.e. whether as a matter of law that time is compensable or not." (*Id.*) And in the Tenth Circuit, the established law is that employees "'should not be compensated for being on call' when they are free to leave their employer's premises and to pursue personal activities." *Boehm v. Kansas City Power & Light Co.*, 868 F.2d 1182, 1184 (10th Cir. 1989) (citing *Norton*, 839 F.2d at 655). In *Robillard v. Board of County Commissioners of Weld County*, this Court, relying on *Boehm*, dismissed an FLSA claim seeking additional pay for time spent on-call as a medical investigator. No. 11-CV-03180-PAB-KMT, 2012 WL 4442822, at *2 (D. Colo. Sept. 26, 2012). In that case, the plaintiff had sued for overtime, alleging that he received a certain amount of case-related calls during each of his 24-hour on-call shifts. *Id.* at *4. But with this information alone, the Court could not decipher to what extent those calls required the plaintiff to actually work, much less whether that work resulted in labor in excess of forty hours per week, as to trigger his right to FLSA overtime. *Id.*

Plaintiffs are correct that Defendants carry the burden on this issue, but Defendants have done so. Even if it was never expressly told

to Plaintiffs that three of their shift hours would be unpaid, an "appraisal of [the parties'] practical construction of the working agreement by [their] conduct," 29 C.F.R. § 785.14, demonstrates that Plaintiffs spent large portions of time waiting to be engaged. As in *Robillard*, the Court cannot locate any facts supporting that Plaintiffs did not have at least three hours per day during which they were "free to leave their employer's premises and to pursue personal activities." *Boehm*, 868 F.2d at 1184. The Court therefore holds, on the factual record submitted by both parties in their motions for summary judgment, that Defendants' exclusion of three hours per day as non-compensable time did not violate the FLSA.

## CONCLUSION

For the foregoing reasons, partial summary judgment is **GRANTED** for Defendants. Plaintiffs' FLSA claims are **DISMISSED WITH PREJUDICE**. Plaintiffs' motion in limine (Doc. 88) is **DENIED AS MOOT**. The remaining claims all sound in state law, and the Court declines to exercise jurisdiction over them. *See Bauchman v. West High Sch.,* 132 F.3d 542, 549 (10th Cir. 1997). The CWCA claims are **DISMISSED WITHOUT PREJUDICE** to Plaintiffs' right to re-file them in a court of appropriate jurisdiction. This case shall be closed.

Dated: March 16, 2020.  BY THE COURT:

_____
Daniel D. Domenico
United States District Judge